**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 21, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROGER BRECHEEN, M.D., individually
and as successor to ROGER BRECHEEN,
P.C., a Wyoming corporation; JACKSON
HOLE OB-GYN P.C., a Wyoming
corporation; KATHY WATKINS-
BRECHEEN, CNM,

     Plaintiffs-Appellants,

v.

MAURA LOFARO, M.D. - Doctor of
Medicine, individually and acting through
MAURA J. LOFARO, M.D., P.C., a
Wyoming corporation; SHANNON
ROBERTS, M.D.,

     Defendants-Appellees.

No. 13-8059
(D.C. No. 1:10-CV-00263-SWS)
(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE,** Chief Judge, **BALDOCK** and **MATHESON**, Circuit Judges.

Plaintiffs Roger Brecheen, M.D., his wife, Kathy Watkins-Brecheen, and Jackson

Hole Ob-Gyn, P.C., a professional corporation formed by Brecheen, filed this action

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

asserting a host of federal and state claims arising out of Brecheen's eviction from an office building in Jackson, Wyoming. Among those were two claims asserted under 42 U.S.C. § 1983, one for deprivation of Brecheen's property interests and another for deprivation of Brecheen's liberty interests, against defendant Maura Lofaro, M.D., a former partner of Brecheen's. The district court granted summary judgment in favor of Lofaro on those claims. Plaintiffs now appeal. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I

*Factual background*

*a) The parties and their employment*

Plaintiff Roger Brecheen, M.D. (Brecheen), is a board-certified obstetrician and gynecologist licensed to practice medicine in the State of Wyoming. Brecheen's wife, plaintiff Kathy Watkins-Brecheen (Watkins-Brecheen), is a certified nurse midwife licensed to practice in the State of Wyoming.

In 1993, Brecheen and his wife moved to Jackson, Wyoming, where Brecheen established a solo practice in obstetrics and gynecology. Watkins-Brecheen began working for Brecheen shortly thereafter. In June 1994, Brecheen formed Jackson Hole Ob-Gyn, P.C. (JHOG), a professional corporation through which he provided obstetric and gynecologic care to his patients.

In July 1997, defendant Maura Lofaro, M.D. (Lofaro), began working for JHOG as a board-certified obstetrician and gynecologist. Lofaro also served as a sponsoring

2

physician for Watkins-Brecheen in her work as a midwife. On March 1, 2000, Brecheen and Lofaro entered into a Stock Purchase and Transfer Agreement pursuant to which each of them became a 50% shareholder of JHOG.

In 2002, defendant Shannon Roberts, M.D. (Roberts), began working for JHOG as an obstetrician and gynecologist. She also, as an employee of JHOG, served as a sponsoring physician for Watkins-Brecheen in her work as a midwife. Roberts was subsequently offered the opportunity to buy into the JHOG partnership, but she declined and continued to work as an employee of JHOG.

*b) The lease agreement*

On June 1, 1994, Zadie, Inc. (Zadie), a corporation owned and operated by Brecheen, entered into a "Hospital 'Campus' Lease Agreement" (Lease Agreement) with the Teton County Hospital District d/b/a St. John's Medical Center (SJMC), to lease Suite 201 of the St. John's Professional Office Building. Aplt. App. at 1151. The intended purpose of the Lease Agreement was to allow JHOG to utilize Suite 201 in the St. John's Professional Office Building for its medical practice.

Paragraph 1.2 of the Lease Agreement outlined the lease term:

> 1.2 <u>Lease Term</u>. The lease term shall be a period commencing on June 1, 1994 and terminating on May 30, 1995, unless extended or terminated in accordance with this Agreement.
>
> The Lessee shall have the option to extend this lease for a period of five additional years to be included as part of the lease term. Any such extension shall be automatic without any further action unless the Lessee gives written notice of non-extension to Lessor by certified mail at least 60 days prior to the end of the original lease term. Any extension term will be

3

treated as part of the lease term.

Aplee. App. at 185.

Paragraph 2.3 of the Lease addressed the subject of modifications to the lease terms:

> 2.3 <u>Entire Agreement</u>. All representations made by the parties in negotiations of this Agreement have been incorporated herein; there are no verbal agreements between the parties or implied duties to modify the terms and conditions thereof, and any further modification of this Agreement must be in writing and signed on behalf of the Lessee and Lessor.

<u>Id.</u> at 189.

On May 30, 2000, the final day of the automatic five-year extension period under the Lease Agreement, SJMC's Assistant Administrator Virgil Boss reviewed and added the following handwritten notations to Paragraph 1.2 of the Lease Agreement (which, as noted, addressed the lease term): "Monthly Rent. $2874.13 + NNM @ 3.50 = $793 mo" and "Month to Month 5/30/00." <u>Id.</u> at 185. Boss then met with Brecheen and reviewed the Lease Agreement and Boss's handwritten notations. Neither Boss nor Brecheen initialed or signed the handwritten notations.

*c) Dissolution of JHOG and the separation of Drs. Brecheen and Lofaro*

Brecheen and Lofaro continued their practice as equal partners in JHOG until early 2007. At that time, they began discussing the possibility of Lofaro purchasing Brecheen's shares in JHOG. The two were unable, however, to agree on a price for Brecheen's share of JHOG. <u>Id.</u>

In the fall of 2007, Lofaro invited Brecheen to attend a mediation on October 19,

4

2007. Brecheen agreed to do so. Lofaro was represented at the mediation by an attorney, as were Brecheen and his wife. The mediation ended with no formal written agreement having been signed and executed by Lofaro and Brecheen. But Lofaro believed that she and Brecheen had agreed on several matters relevant to the dissolution, and Brecheen conceded that they "theoretically reached an agreement to dissolve" JHOG, Aplee. App. at 419, with "some details pending [his] leaving [Suite 201] . . . to be worked out," id. at 420.

Shortly after the mediation session ended, Lofaro contacted Boss and told him, in pertinent part, that: she and Brecheen had dissolved JHOG; she and her staff would remain in Suite 201; Brecheen and his staff would need new space or an alternative space for eighteen months opposite Suite 201; she and Brecheen would be splitting JHOG's accounts receivable and she would be taking JHOG's furniture; and Brecheen had signed an Arbitration Agreement.

On October 26, 2007, James Schuessler, SJMC's CEO, sent a letter to Lofaro "acknowledging [her] verbal notice . . . that J[HOG] w[ould] be dissolving effective November 30, 2007, pending final legal documents." Aplee. App. at 205. The letter further informed Lofaro: "As Lessee of Suites 201 and 203 in the Professional Office building, you will be required to have [SJMC] approval for any new business entity transfer or assignment on December 1, 2007." Id. Schuessler sent a copy of his letter to Brecheen and, on November 15, 2007, Brecheen sent a letter to Schuessler acknowledging receipt of Schuessler's October 26, 2007 letter. In his letter of November

5

15, 2007, Brecheen stated, in pertinent part, that "dissolution [of JHOG] w[ould] not be completed by November 30th, [but that] this separation of a long-standing medical practice w[ould] occur soon," and that he "w[ould] be moving [his] medical practice off the campus of SJMC." Id. at 207.

Following the mediation, Brecheen vacillated openly, in a series of emails exchanged with Lofaro, regarding whether to keep his practice in Suite 201 or to move it elsewhere. For example, in an email sent to Lofaro on October 30, 2007, Brecheen stated, in pertinent part: "Relax about the dissolution. I have no problem with that and the sooner the better. All that is left undecided about any of this in my mind is where I will do what my plans involve. You have the ability to decide/influence that . . . your choice." Id. at 375. And, on or around October 30, 2007, Brecheen indicated to Lofaro that he intended to vacate Suite 201 and leave Lofaro responsible for the employees of JHOG. At or about that time, Brecheen was apparently exploring options that included joining a medical practice in Wilson, Wyoming, or becoming chief of obstetrics/gynecology at a hospital in Afton, Wyoming.

Lofaro proceeded to move forward with the intention of keeping her post-JHOG practice in Suite 201. On October 31, 2007, Boss prepared a new lease agreement for Suite 201. The tenant was Gros Ventre OB-GYN, LLP, an entity formed by Lofaro and Roberts. Lofaro executed this lease agreement on or about November 2, 2007. According to its express terms, this lease agreement became effective on December 1, 2007.

6

On November 5, 2007, Clay Geittmann, an attorney representing Lofaro, sent an email to Brecheen's attorney, Scott Klosterman, stating in pertinent part that "[i]n case the office space bec[ame] an issue for Dr. Brecheen," Lofaro was "still amicable to having Dr. Brecheen use the Teton Laser Center space [also located in the SJMC Professional Building] at no cost to Dr. Brecheen." Aplee. App. at 382. Three days later, on November 8, 2007, Geittmann sent an email to Klosterman stating, in pertinent part, that Lofaro "w[ould] be ready to go with the 12/1 transition date." Id. at 383.

On December 3, 2007, Andrea Richard, another attorney representing Lofaro, sent a letter to Klosterman stating, in pertinent part:

> Our firm has been asked to assist Dr. Maura Lofaro, MD in connection with the separation of Dr. Lofaro's practice from Dr. Brecheen's practice and the dissolution of [JHOG].
>
> * * *
>
> Despite the parties' agreement on the date for a completed transition, we understand that Dr. Brecheen is planning to see patients in the office this week. We are willing to accommodate his need to see patients in the office this week. As you and Dr. Brecheen know, the existing office space is being leased by Dr. Lofaro's new practice effective December 1, 2007. It is only fair to both Dr. Brecheen and Dr. Lofaro that the overdue transition between the parties be completed. Thus, Dr. Brecheen's use of and access to the office will end on Monday, December 10th, 2007 at 5:00 p.m. * * *
>
> With respect to the legal aspects of the dissolution, those must also be accomplished as soon as possible and without any further delay. As we understand it, the parties participated in a mediation on Friday, October 19, 2007. Mark Gifford served as the mediator and the parties were successful in reaching an agreement. The agreement the parties reached included the specific terms for the dissolution of [JHOG] . . . .

Id. at 363-64.

7

On December 5, 2007, Lofaro sent an email to Brecheen stating as follows:

> Roger - Shannon [Roberts] and I heard that you are moving to an office in Wilson and perhaps that space is not ready for occupancy. We would like to speak with you in person to try and figure out a reasonable solution so that you do not have to move twice in the next month. * * * We would like to get a timeline from you, work out a solution so that I can get Andrea Richard off of your back, and we can finish JHOG dissolution/collections/ allocation of equipment in a humane professional manner.

Id. at 367.

On December 6, 2007, Lofaro asked Boss to have the locks on the doors of Suite 201 changed. Lofaro also asked Boss about having Brecheen's name removed from the signage.

On Monday, December 10, 2007, Brecheen arrived for work at Suite 201 to see his scheduled patients. At the end of that day, Lofaro approached Brecheen and "asked him not to continue to show up to see patients." Aplt. App. at 1165. Brecheen stated in response that he would leave Suite 201 when his new office space in Wilson, Wyoming, was ready.

On that same day, December 10, 2007, Richard (Lofaro's attorney) sent a letter to Brecheen's attorney stating, in pertinent part:

> As you know on December 3, 2007, we forwarded a letter concerning the various deadlines that Dr. Brecheen and Dr. Lofaro agreed to during their mediation and later memorialized in their Separation and Dissolution agreement. As we advised in our December 3, 2007, letter, Dr. Brecheen's use of and access to the former [JHOG] office will end on Monday, December 10th, 2007 at 5:00 p.m. Dr. Lofaro had a discussion with Dr. Brecheen today confirming the same again.

8

As you know, Dr. Lofaro has attempted to work with Dr. Brecheen to make this transition occur with as little disruption as possible to either party. Nevertheless, the time has come and the transition, which was due to be accomplished by November 30, 2007, needs to be completed. Because the lease to the office space is no longer held by [JHOG], Dr. Brecheen has no legal right to occupy or use the former [JHOG] office space to see patients or conduct other activities. We would appreciate your efforts to aid in this transition.

Aplee. App. at 366.

At approximately 9:00 a.m. on December 11, 2007, Sergeant Alan John of the Jackson Police Department, accompanied by another officer, arrived in uniform at the Professional Office Building in which Suite 201 was housed. Lofaro had purportedly requested their presence. Sergeant John was met by Boss and Jim Schuessler, who informed him that Brecheen needed to be evicted from Suite 201. When Brecheen arrived at Suite 201 shortly after 9:00 a.m. that morning, he was met by Sergeant John. Sergeant John escorted Brecheen inside one of the offices in Suite 201 and informed him: "I was here to keep the peace, but that I was told that he was being evicted and that I was asking him to act like a gentleman and allow me to keep the peace." Aplt. App. at 1166. Sergeant John then escorted Brecheen out to the parking lot. After speaking briefly, Brecheen asked Sergeant John if he could go back inside to get his coat and make arrangements to have an inventory of everything in the office. Sergeant John agreed, and the two men walked back towards Suite 201. In a hallway outside of Suite 201, Brecheen and Sergeant John spoke with Boss and Schuessler. Schuessler and Boss confirmed that they had terminated JHOG's lease for Suite 201.

9

Brecheen continued to practice medicine at SJMC, albeit not out of Suite 201, following the events of December 11, 2007. In particular, Brecheen continued to practice at SJMC through early 2009, when he voluntarily resigned his privileges. Since that time, Brecheen has been employed by Star Valley Medical Center in Afton, Wyoming, and Powell Valley Hospital in Powell, Wyoming.

*Procedural background*

On December 9, 2010, Brecheen, Watkins-Brecheen and JHOG initiated this action by filing suit against Lofaro, Roberts, SJMC, the Board of Trustees for SJMC, Schuessler, Boss, and three other officers of SJMC. The complaint alleged the following claims: "(1) deprivation of Plaintiffs['] contractual and property rights guaranteed under the United States and Wyoming Constitutions; (2) interference with Plaintiffs' medical practices and legitimate business interests; (3) breach of contract; (4) breach of the implied covenant of good faith and fair dealing; (5) intentional interference with contractual relationships; (6) intentional interference with prospective economic advantage; (7) civil conspiracy; (8) negligent supervision; (9) defamation; and (10) intentional infliction of emotional distress." Aplt. App. at 27.

The claims against SJMC, the Board of Trustees for SJMC, Schuessler, Boss and the three other officers of SJMC were ultimately dismissed by the district court, leaving only the claims asserted against defendants Lofaro and Roberts. See Dist. Ct. Docket Nos. 80 (dismissing certain claims against Board of Trustees for SJMC), 170 (dismissing claims against Schuessler, Boss, and three other SJMC officers), 185 (dismissing

remaining claims against SJMC and Board of Trustees).

On March 13, 2013, defendants Lofaro and Roberts filed a joint motion for summary judgment with respect to the claims asserted against them. This included three federal claims asserted by Brecheen against Lofaro (deprivation of property without due process of law, in violation of 42 U.S.C. § 1983; deprivation of liberty interest without due process of law, in violation of 42 U.S.C. § 1983; and conspiracy to deprive Brecheen of his constitutionally-protected rights, in violation of 42 U.S.C. § 1985(3)), one federal claim asserted by Brecheen against Roberts (conspiracy to deprive Brecheen of his constitutionally-protected rights, in violation of 42 U.S.C. § 1985(3)), and three state law claims asserted by Brecheen against Lofaro and Roberts (intentional interference with contractual relationships and unlawful interference with prospective advantage; breach of the implied covenant of good faith and fair dealing; and intentional infliction of emotional distress). It also included a single federal claim asserted by Watkins-Brecheen against Lofaro and Roberts for conspiracy to deprive her of her constitutionally-protected rights, in violation of 42 U.S.C. § 1985(3), and state law claims asserted by Watkins-Brecheen against Lofaro and Roberts for breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress.

On May 24, 2013, the district court issued a written order granting Lofaro's and Robert's motion for summary judgment with respect to the federal claims asserted against them. In doing so, the district court focused first on plaintiffs' federal claims. With respect to the claim that Lofaro deprived Brecheen of property without due process of

11

law, the district court concluded that Brecheen had no protectable property interest in the lease to Suite 201 on December 11, 2007, when he was evicted from Suite 201. Aplt. App. at 1561. With respect to the claim that Lofaro deprived Brecheen of a liberty interest in practicing medicine, the district court concluded that Brecheen had failed to establish the kind of alteration in legal status necessary to give rise to a cognizable liberty interest claim. Lastly, the district court concluded that plaintiffs' assertions that Lofaro and Roberts "conspired to deprive them of their constitutional rights on the basis of their age" failed "[b]ecause as a matter of law, an age discrimination claim cannot serve as the basis of a § 1985(3) claim." Id. at 1572.

After disposing of plaintiffs' federal claims against Lofaro and Roberts, the district court concluded that "this matter [wa]s, at its heart, a relatively straightforward dispute concerning the termination of the parties' professional relationship" that gave rise to "state law claims that [we]re best decided in the state court forum." Id. at 37. Consequently, the district court "determine[d] that outright dismissal of the pendant state law claims, without prejudice, [wa]s . . . appropriate," particularly in light of the fact that there was an "ongoing state court action with which th[o]se claims [we]re intertwined." Id. at 36.

Judgment was entered in the case on May 24, 2013. Plaintiffs filed a timely notice of appeal.

## II

On appeal, plaintiffs challenge only two parts of the district court's order granting

summary judgment in favor of defendant Lofaro. First, they contend that the district court erred in rejecting Brecheen's § 1983 claim that he was deprived by Lofaro of a constitutionally-protected property interest in Suite 201. Second, they contend that the district court erred in rejecting Brecheen's claim, likewise brought under § 1983, that he was deprived by Lofaro of a liberty interest in practicing medicine. For the reasons described in greater detail below, we reject plaintiffs' arguments and conclude that the district court properly granted summary judgment in favor of Lofaro on both of these claims.

*Standard of review*

We review a grant of summary judgment de novo, applying the same standard as the district court. Braswell v. Cincinnati Inc., 731 F.3d 1081, 1085 (10th Cir. 2013). "Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Squires v. Breckenridge Outdoor Educ. Ctr., 715 F.3d 867, 872 (10th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). We "may affirm the decision of the district court on any basis for which there is support in the record." Sanchez v. Vilsack, 695 F.3d 1174, 1180 (10th Cir. 2012).

*Deprivation of a property interest in Suite 201*

Brecheen alleged in his complaint that, on December 11, 2007, Lofaro deprived him of a constitutionally-protected property right by excluding him from Suite 201. To prevail on this claim under 42 U.S.C. § 1983, Brecheen must establish, in pertinent part, that he was "deprived of a right 'secured by the Constitution and the laws' of the United

States." Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 155 (1978); see Johnson v. Rodrigues, 293 F.3d 1196, 1203 (10th Cir. 2002).

"For purposes of the Fourteenth Amendment's Due Process Clause, property interests must derive from some independent source, such as state law, contract, or other understandings that give rise to a claim of entitlement." Eisenhour v. Weber County, 744 F.3d 1220, 1232 (10th Cir. 2014). A possessory interest in property that arises from a contract, such as a lease, has been held "sufficient to invoke the protection of the Due Process Clause." Fuentes v. Shevin, 407 U.S. 67, 87 (1972) (involving possessory interest in goods that arose under a conditional sales contract); see Thomas v. Cohen, 304 F.3d 563, 576 (6th Cir. 2002) (holding that, "[u]nder Kentucky law, tenants holding leasehold estates have a recognized property interest"). Under Wyoming state law, a leasehold tenant has a possessory interest in the real property at issue. See Wolin v. Walker, 830 P.2d 429, 433-34 (Wyo. 1992); see generally Connaghan v. Eighty-Eight Oil Co., 750 P.2d 1321, 1323 (Wyo. 1988) ("A person can undertake actual possession of an interest in real property if the interest is possessory or related to the land in such a way that it can be actually possessed.").

The district court in this case properly recognized and applied these principles, and ultimately concluded that Brecheen lacked a possessory interest in Suite 201. More specifically, the district court concluded that, "even accepting . . . Brecheen's version of the facts as true, as of December 7, 2007, he was aware that [SJMC] had entered into a lease agreement for Suite 201 with another medical practice [Gros Ventre] effective

14

December 1, 2007." Aplt. App. at 1560-61. This action on the part of SJMC, the district court concluded, "constitute[d] 'affirmative action' indicating a desire that [Brecheen] surrender the premises." Id. at 1561. In short, the district court concluded, under Wyoming law, Brecheen "held no more than a tenancy by sufferance" as of December 11, 2007, and thus SJMC and Gros Ventre "were perfectly within their rights to exclude . . . Brecheen from Suite 201 on the morning of December 11, 2007." Id.

Plaintiffs argue that, contrary to the conclusion reached by the district court, "Brecheen held a protected property interest in Suite 201, i.e., a periodic tenancy, not a tenancy by sufferance." Aplt. App. at 1175. According to plaintiffs, when Boss "made [hand]written modifications to material terms of the Lease Agreement" on May 30, 2000, "the parties to th[e] [Lease Agreement] changed so that a new month-to-month lease agreement was created between SJMC and . . . Brecheen." Aplt. Br. at 32. "This is also evidenced," plaintiffs assert, "by the fact that, through December 2007, SJMC directed its correspondence and billing invoices relating to Suite 201 to 'Roger Brecheen, M.D.'" Id. (quoting Aplt. App. at 1227). Plaintiffs also point to the deposition testimony of Boss, in which he "testified that 'month-to-month' meant '**the tenant** [Dr. Brecheen] **has the flexibility to leave with a month's notice**' and if the tenant went into default, SJMC could evict the tenant on a month's notice." Id. (quoting Aplt. App. at 1195; emphasis added by Appellants).

Plaintiffs' arguments prove to be flawed. To begin with, the evidence in the record does not support their assertion that the handwritten notations made by Boss on the Lease

15

Agreement resulted in a change to the parties to the Lease Agreement. The Lease Agreement, by its express terms, was between SJMC and Zadie. Nothing in Boss's simple, handwritten notations could reasonably be construed as substituting Brecheen, in his personal capacity, for Zadie as the tenant. Indeed, Boss's handwritten notations made no reference whatsoever to Zadie or Brecheen. Consequently, the record in this case establishes that any possessory interest in Suite 201 that arose out of the Lease Agreement belonged to Zadie, not Brecheen personally.[1]

Furthermore, Boss's handwritten notations were insufficient to successfully modify the terms of the Lease Agreement. As noted, Paragraph 2.3 of the Lease Agreement stated, in pertinent part, that "any further modification of this Agreement must be in writing and signed on behalf of Lessee and Lessor."[2] Aplee. App. at 189. Although Boss's intended modifications were "in writing," neither Boss nor Brecheen signed to indicate their approval of those modifications. Consequently, the intended modifications were not effective, and the Lease Agreement expired by its own terms effective May 30, 2000.

Finally, because the Lease Agreement expired by its own terms, the relationship between SJMC and Zadie became, by operation of Wyoming Law, a tenancy by

---

[1] The district court's order granting summary judgment in favor of Lofaro and Roberts makes reference to Zadie "no longer exist[ing] as a legal entity." Aplt. App. at 1559. Precisely how and when Zadie ceased existing is unclear from the record.

[2] Paragraph 2.3 is consistent with Wyoming law, which requires lease renewals to be "in writing" and "signed by the parties thereto." Wyo. Stat. Ann. § 34-2-129 (2013).

16

sufferance. Wyoming law provides that only "a tenancy by sufferance" may exist in Wyoming "by implication or operation of law." Wyo. Stat. Ann. § 34-2-128 (2013). Consequently, "[u]pon the expiration of a term created by lease, . . . there shall be no implied renewal of the same, for any period of time whatever, either by the tenant holding over or by the landlord accepting compensation or rent for or during any period of such holding over." Id. Instead, "[s]uch holding over by the tenant and acceptance of rent by the landlord shall constitute only a tenancy by sufferance, with the rights, duties, obligations and incidents of such tenancy."[3] Id. And, under Wyoming law, "a tenancy by sufferance can be terminated by re-entry or any affirmative action on the part of the landlord which indicates that he desires the tenant to surrender the premises occupied by the latter." Welch, 159 P.2d at 506. Therefore, it was entirely appropriate for SJMC officials, as representatives of the landlord, to bar Brecheen from Suite 201 on and after December 11, 2007.

For these reasons, we conclude that the district court did not err in granting summary judgment in favor of defendant Lofaro on Brecheen's claim that Lofaro deprived him of a constitutionally-protected property right by excluding him from Suite 201.

---

[3] Although Brecheen suggests that a tenancy by sufferance arises only when a tenant wrongfully holds over past the expiration of the lease term, the Supreme Court of Wyoming has quite clearly indicated that "[a] tenant by sufferance is one who holds *by permission or indulgence*, without any right." Welch v. Rice, 159 P.2d 502, 524 (Wyo. 1945) (emphasis added); see also Hutchinson v. Taft, 222 P.3d 1250, 1255-56 (Wyo. 2010) (noting that a tenancy at sufferance is a permissive interest and discussing limited circumstances under which permissive possession by tenant can become hostile).

17

*Deprivation of liberty interest*

Brecheen also asserted a second § 1983 claim against Lofaro: that Lofaro, by way of "illegally remov[ing]" him from Suite 201 and contemporaneously making defamatory statements about him, deprived him of "his ability to practice medicine, a protected liberty interest." Aplt. App. at 1168 (plaintiffs' response to Lofaro's motion for dismissal or summary judgment). The district court granted summary judgment in favor of Lofaro on that claim. In doing so, the district court noted that "the record reveal[ed] several alternate bases for granting summary judgment" in Lofaro's favor. Aplt. App. at 1571. We agree.

As an initial matter, we question whether Brecheen's claim can survive in light of our conclusion that he was legally evicted from Suite 201. To be sure, our ruling on that issue still leaves in place Brecheen's allegation that Lofaro made defamatory statements about Brecheen. But Brecheen has consistently argued that it was the combination of those statements <u>and</u> his illegal removal from Suite 201 that deprived him of a liberty interest. In other words, Brecheen has never argued that the defamatory statements, standing alone, resulted in the purported deprivation. And, in any event, our examination of the record persuades us that a jury could not reasonably make such a finding.

We also conclude that Brecheen failed to present sufficient evidence to allow a jury to reasonably find that Lofaro acted under color of state law in making the purported defamatory statements. To prevail on a cause of action under § 1983, a plaintiff must establish "that some person has deprived him of a federal right," and "that the person who

18

has deprived him of that right acted under color of state or territorial law." Gomez v. Toledo, 446 U.S. 635, 640 (1980). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999) (internal quotation marks omitted). In her motion for summary judgment, Lofaro argued, in pertinent part, that Brecheen had failed to "establish[] that [she] deprived [him] of a right secured by the Constitution[] or federal law while acting under the color of state law." Aplt. App. at 1039; see id. at 1044 (arguing that Brecheen failed to "show[] . . . government defamation"). Brecheen's brief in response to Lofaro's motion for summary judgment was virtually silent on this point. And, as the district court subsequently noted, "there [wa]s no evidence suggesting any of th[e] [defendant] state actors participated in, repeated, or otherwise ratified the defamatory statements allegedly made by . . . Lofaro about . . . Brecheen, or further that the statements were in any way connected to the eviction or removal of . . . Brecheen from Suite 201."[4] Id. at 1570.

Accordingly, we conclude that the district court did not err in granting summary judgment in favor of defendant Lofaro on Brecheen's claim that Lofaro deprived him of a

_____

[4] We acknowledge that the district court did not grant summary judgment in favor of Lofaro on this basis because it concluded that Lofaro "fail[ed] to set forth any meaningful argument on this issue." Aplt. App. at 1571. Our review of Lofaro's motion for summary judgment persuades us otherwise. To be sure, Lofaro's arguments on the issue were not elaborate. But they were, regardless, sufficient to require some type of response from Brecheen and to place the issue squarely before the district court.

19

constitutionally-protected liberty interest.[5]

                                    III

The judgment of the district court is AFFIRMED.  Volume 5 of the supplemental

appendix will remain sealed, as will all materials previously submitted as sealed.  The

motion to strike the supplemental appendix is DENIED.


                                    Entered for the Court


                                    Mary Beck Briscoe
                                    Chief Judge

---

[5] In granting summary judgment in favor of Lofaro, the district court concluded that Brecheen had failed to "identify the kind of alteration in legal status necessary to set forth a cognizable liberty interest claim."  Aplt. App. at 1564.  We need not reach that question.